UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) No. 2:18-CR-00179-2-JRG-CRW |
| | ) |
| PAULA SUE ANSON | ) |

## MEMORANDUM OPINION AND ORDER

The defendant, Paula Sue Anson, ("defendant" or "Anson"), is awaiting sentencing after her conviction for conspiracy to distribute five grams or more of methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B). [Presentence Investigation Report ("PSR"), Doc. 127 at 1]. The probation officer who prepared the PSR assigned a base offense level of 28 for the stipulated quantity of at least 35 but less than 50 grams of actual methamphetamine, USSG § 2D1.1(a)(5), added two levels for maintaining premises for the purpose of manufacturing or distributing a controlled substance, *id.* § 2D1.1(b)(12), reduced the offense level by two levels because the defendant meets the criteria for safety valve, *id.* §§ 5C1.2, 2D1.1(b)(17), reduced the offense level by three levels for acceptance of responsibility, *id.* §§ 3E1.1(a) & (b), for a total offense level under the Sentencing Guidelines of 25. [Doc. 127, ¶¶ 24, 25, 26 33]. When combined with Anson's Criminal History Category I, the resulting advisory guidelines range for imprisonment is 57 to 71 months. [*Id.* ¶ 56]. The defendant objects to the § 2D1.1(b)(12) enhancement and to the fact that the probation officer did not apply an adjustment downward for a minor or minimal participant role pursuant to USSG § 3B1.2. [Docs. 226, 256]. For the reasons which follow, both objections are **OVERRULED**.

The Sentencing Guidelines instruct the Court to increase the offense level by two levels "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled

1

substance." USSG § 2D1.1(b)(12). The enhancement "applies to anyone who (1) knowingly (2) opens or maintains any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013). A defendant may maintain a "building, room, or enclosure" for the purpose of distributing drugs even if that is not "the sole purpose for which the premises was maintained." USSG § 2D1.1 cmt. n.17. A defendant may qualify for the enhancement so long as "one of [her] primary or principal uses for the premises" is the distribution of drugs. *Id.* A defendant need not maintain the whole residence for distribution of drugs to qualify for the enhancement; the use of a "room" or other "enclosure" is sufficient. *Id*. This is a relatively low bar: "[d]rug storage on the property and transactions on the property will usually suffice." *United States v. Bell*, 766 F.3d 634, 638 (6th Cir. 2014). "At bottom, the question is whether the defendant's home 'played a significant part' in distributing drugs." *Id.* at 637 (quoting *Johnson*, 737 F.3d at 449). Defendants will often both live in and conduct drug business from their house. *Id*. at 638.

The defendant does not contest the first two elements; she admits that she knowingly maintained the house located at 1223 Doe Creek Road in Butler, Tennessee. The dispute here is over whether she did so for the purpose of distributing a controlled substance, the third element. As noted above, distribution of drugs need not be the sole purpose for which a premises is maintained, but it must be a primary or principal use rather than an incidental or collateral use of the premises for the enhancement to apply. USSG § 2D1.1(b)(12) cmt. n. 17; *Johnson*, 737 F.3d at 447. The guidelines commentary instructs the Court to "consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes" in determining whether manufacturing or distribution was "one of defendant's primary or principal uses of the premises."

2

The facts here are undisputed. Anson was a member of a drug trafficking organization operating under the direction of co-defendant Richard Hall, with whom she conspired during the timeframe of the conspiracy alleged in the indictment, i.e., "on or about February 1, 2015, and continuing to on or about November 14, 2018." [Docs. 3 & 127, ¶ 10]. She is the owner of the premises located at 1223 Doe Creek Road where she lived with Hall. Anson had lived at the residence as her primary residence since 1996. She raised her children in the home. About three years before April 2016, Hall moved into the residence with Anson. [Doc. 226].

On April 26, 2016, Emergency Medical Services responded to a 911 call from Anson to 1223 Doe Creek Road. Anson reported that Hall and another person, Jeff Stout, were acting crazy and had received some "bad dope." Hall and Stout were transported to the hospital where Stout ultimately died as the result of an overdose. [Doc. 127, ¶¶ 11, 17]. Anson consented to a search of the residence. Officers seized 16 grams of methamphetamine, some marijuana, one hydrocodone tablet, drug paraphernalia, digital scales, a Fabrinor (model firestorm) .45 caliber semi-automatic handgun belonging to Hall with ammunition, and $15,365 in United States currency. [*Id.* ¶¶ 12, 17].

Hall was a major supplier of methamphetamine in East Tennessee, supplying multiple pound quantities per week to other distributors. A confidential source ("CS") stated that Travis Reece, a co-conspirator, was receiving approximately three pounds of methamphetamine per week from Hall, who stored the methamphetamine in plastic storage containers. [Doc. 95, ¶ 4(c)]. Reece stated that Hall was his primary source of methamphetamine, that he paid Hall $600 per ounce, and that he had been buying methamphetamine from Hall for about one year. Reece stated that the transactions typically took place at Hall's residence at 1223 Doe Creek Road and that Hall bought methamphetamine from a source of supply in Georgia. [*Id.* ¶ 4(f)]. Anson made eight to ten trips

with Hall to Georgia, bringing back $4,000 to $5,000 worth of methamphetamine each time. [Doc. 124 ¶ 14].

Another CS stated, during an interview on November 15, 2016, that another co-conspirator, Jamie Ferguson,[1] was also supplied with methamphetamine by Hall after Ferguson was released from jail subsequent to being jailed in October 2015. The CS stated that Hall and Anson picked up money from Ferguson and CS and, upon their return, supplied methamphetamine to Ferguson. The CS stated this happened eight to ten times. [*Id.* ¶ 13].

On January 17, 2017, another CS was interviewed pursuant to a proffer agreement with the United States Attorney's Office and stated that he provided money to Hall, who then drove to northern Georgia to purchase methamphetamine from his source. Upon return, Hall delivered 7 to 10 ounces of methamphetamine to the CS, who paid $800 an ounce. These purchases occurred at least once a week for approximately three months. Hall purchased 20 to 30 ounces of methamphetamine at a time in Georgia. [*Id.* ¶ 14].

On February 22, 2017, a controlled purchase of approximately 3.5 grams of methamphetamine was made from Hall at the 1223 Doe Creek Road residence. [*Id.* ¶ 18; Doc. 95, ¶ 4(g)]. On November 29, 2017, another co-defendant, Bradley Allen Wills, was interviewed by law enforcement officers. Wills was arrested while in possession of nearly two ounces of methamphetamine, which he stated came from Hall. Wills said that Hall supplied him with approximately six ounces of methamphetamine per week from September to November 2017. In August, Wills was fronted five ounces of methamphetamine by Hall at a price of $700 an ounce. Wills stated that the only place he ever received methamphetamine from Hall was the garage at 1223 Doe Creek Road. Wills stated that he had also witnessed co-defendants Joshua Kope and

---

[1] Ferguson was charged in a separate case in this Court, No. 2:16CR82.

4

Joshua Long and others pick up methamphetamine from Hall at the garage. [Doc. 127, ¶ 19; Doc. 95, ¶ 4(i)].

While Hall was incarcerated in June, 2018, Anson continued to use Hall's cellular phone. She utilized the phone to contact directly Hall's source of supply and Hall's distributors. Anson and Hall continued to communicate with each other on jail calls about drug proceeds at their residence and Anson's contact with Hall's supplier. Hall also directed Anson to pick up proceeds of drug sales during his incarceration, which she did using text messages to Hall's distributors. [Doc. 127, ¶ 15].

Other, more specific, details were proffered by the government, without objection from the defendant, at the hearing on the objections on August 12, 2020. The sixteen grams of methamphetamine seized during the consent search, conceded by Anson to be a distribution quantity, was located in the bedroom of the home shared by Anson and Hall, as were two stacks of money totaling $2,000 inside the top drawer of a dresser, and a wooden box containing several stacks of money ($13,020) with rubber bands around them in a gun safe. Baggies and digital scales were also found. The bedroom door was secured by a deadbolt and the garage was locked. Anson had a key for both. Anson told the investigator that she did not know Hall sold drugs. She claimed she did not know about the money in the dresser drawer. Officers located a loaded .45 caliber handgun which Anson said belonged to her husband and she said she had a small pistol in the safe with her money for rent. Anson told the officer how much money was in the safe. The money was in one thousand-dollar rolls. She first said the money was from the sale of some tools but upon further questioning by the officer, she said she did not know where it came from. [Taken from the Court's notes of the hearing and a rough real-time transcript].

5

The calls between Hall and Anson, though, clearly establish that Anson knew about the money and its source. During one of the calls, Hall directed Anson to look in the drawer beside the dresser and put "all that money" in the safe. Anson said she was "on it already" and thought she might get a safe-deposit box instead because she was afraid that "they" might be listening to the call and might "raid me"[2] again. [*Id.*].

The Court is a little unclear as to the precise contours of Anson's argument on this objection. She seems, however, to offer several arguments. First, she appears to argue that her primary use of the 1223 Doe Creek Road property was for a primary residence for herself; her prior husband, Jimmy Lee Anson, from 1996 to his death in 2015, at which time Hall moved in; and a place where she raised her children, the youngest of whom appears to be 29 years old. Even so, as noted above, the distribution of drugs need not be the sole purpose for maintaining the premises, only a primary or principal use. Second, she appears to argue that whatever drug dealing occurred on the property occurred in a detached garage, not in the residence. Again, that appears to be mostly irrelevant since the enhancement applies even if only an outbuilding or single room was used for distribution purposes.

Anson also appears to argue that the circumstances in her case are not indicative of a "'[drug] business that [is] present' in the home." *Johnson*, 737 F.3d at 447 (quotation omitted). Characteristics of such a business, says the defendant, include storage of drugs and the presence of "tools of the trade," such as "laboratory equipment, scales, guns and ammunition to protect the inventory and profits," "large quantities of cash," and "multiple employees or customers." *Id.* at 447–48. Other factors, she notes, are frequency of deliveries, the significance of the premises to the

---

[2] Hall had been arrested on April 21, 2016, by state authorities and charged with possession of methamphetamine with intent to distribute, maintaining a premises for the purpose of distributing drugs, and possession of a firearm by a convicted felon. It is unknown whether any money was seized on this is date or whether this is the occasion to which she was referring.

overall drug trafficking organization, and the scope of the enterprise. *Id.* The facts of her case do not involve these factors, she argues. Her assertions are unsupported by the evidence as more fully discussed below.

Anson also seems to claim that the evidence here regarding the residence is more indicative of addiction and personal use than drug trafficking, noting that officers first went to the residence based on a report of possible overdose victims. She states that "[o]bvious signs of addiction were scattered throughout the home." [Doc. 226, at 4]. Anson also claims that "[t]he house did not contain laboratory equipment, inventory, ledgers or employees and/or customers." [*Id*. at 5]. The defendant is correct that "personal use is not distribution" and "the premises enhancement will not apply where a 'defendant keeps drugs in the house for casual personal use.'" *United States v. Uminn,* 820 F. Appx 353, 357 (6th Cir. 2020) (quoting *Johnson*, 737 F.3d at 449). Again, however, defendant does not present a full statement of the facts, as explained below.

In any event, it is the government's burden to establish by a preponderance of the evidence that the enhancement applies. *United States v. Byrd*, 689 F.3d 636, 640 (6th Cir. 2012). In this Court's view, the government has more than met its burden on this enhancement. As noted above, only the third element of the premises enhancement is at issue, i.e., whether the defendant maintained the premises at 1223 Doe Creek Road "for the purpose of manufacturing or distributing a controlled substance."

Anson admits that she both lived with and conspired with Richard Hall, a major methamphetamine trafficker, to distribute methamphetamine. The premises at 1223 Doe Creek Road became the "base of operations" for the drug trafficking organization headed by Hall. Over the course of the conspiracy, pounds of methamphetamine were delivered to co-conspirators from the residence, usually from a detached garage on the premises. Anson knew what was taking place

and <u>participated</u> in the conspiracy. She made eight to ten trips to Georgia with Hall to purchase methamphetamine from Hall's suppliers, bringing back at least $4000 to $5000 worth of methamphetamine each trip. Although defendant's counsel has argued that there is no evidence that the methamphetamine was stored on the premises, the evidence establishes otherwise. First, there is no evidence that the methamphetamine was stored at any location other than at the 1223 Doe Creek Road premises; indeed, the methamphetamine was driven from Georgia and then in large part distributed from the residence, or a detached garage, leading to the only conclusion possible—that the methamphetamine was stored at the premises for at least some period of time. Not only that, 16 grams of methamphetamine, admitted by Anson to be a distribution quantity, was seized from the bedroom of the residence, not the detached garage. On February 22, 2017, a controlled purchase of 3.5 grams of methamphetamine was made from the residence, also suggesting that the methamphetamine not only was stored at the residence but also repackaged there, since the methamphetamine was bought from the supplier in ounce quantities. During one of Anson's trips to Georgia with Hall, Hall counted out—in front of Anson—$40,000 in cash, which he had received from a co-conspirator to purchase methamphetamine. Digital scales, baggies, $15,365 in cash, and two firearms were found at the premises in the bedroom shared by Anson and Hall on April 26, 2016, all tools of the drug trade, along with a distribution quantity of methamphetamine. Both Anson and Hall had a key to the deadbolt lock on the bedroom door and Anson had a key to the safe in the bedroom with several thousand dollars of drug sale proceeds.

The extent of Anson's personal involvement in the drug-related activities at the premises during the conspiracy is perhaps best shown by the texts and phone calls which occurred after Hall was arrested and jailed. Using Hall's cellular phone, Anson was in direct contact with Hall's source of supply and his distributors. She was actively collecting and picking up proceeds owed to Hall

8

for drug sales. She was in possession of proceeds and stored them in her bedroom, indicating on one of the phone calls that she intended to get a safe-deposit box to prevent their seizure. Hall's distributors obviously knew Anson and understood her to be speaking and acting with the authority of Hall during his incarceration.

This objection is **OVERRULED**. The two-level enhancement in the offense level for maintaining a premises for the purpose of distribution of drugs was correctly applied by the probation officer.

Next, the probation officer did not apply a reduction in the offense level pursuant to USSG § 3B1.2. Anson objects, arguing that her participation in the offense was "minor" or "minimal." The burden is on the defendant as the proponent of the adjustment, to show by a preponderance of the evidence that she is entitled to a mitigating role adjustment. *United States v. Sturgill*, 761 F. Appx. 578, 584 (6th Cir. 2019) (citing *United States v. Roberts*, 223 F.3d 377, 379 (6th Cir. 2000)).

Section 3B1.2 of the sentencing guidelines directs a sentencing court to decrease the offense level if the defendant played a mitigating role in the criminal activity. If the defendant was a "minimal participant," then the offense level is decreased by four levels. USSG § 3B1.2(a). If she was a "minor participant," then the decrease is two levels. *Id*. § 3B1.2(b). In cases "falling between" those categories, the level is decreased by three levels. *Id*. § 3B1.2.

Prior to November 2015, the commentary to the section read:

> The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent on the facts of the particular case.

*Id.* § 3B1.2, cmt. n. 3(c) (2014). Beginning November 1, 2015, Amendment 794 added the following:

> In determining whether to apply subsection (a) or (b), or an intermediate adjustment, the court should consider the following non-exhaustive list of factors:

9

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v) the degree to which the defendant stood to benefit from the criminal activity.

*Id.* § 3B1.2, cmt. n.3(C) (2016). According to the Sentencing Commission, the change was made because courts had been applying the reduction inconsistently to otherwise comparable defendants. *See* USSG App. C, amend. 794, at 115 (Suppl. 2016).

Circuit Courts of Appeal had split on whom a defendant should be compared to. Before Amendment 794, application note 3(A) explained that the mitigating role adjustment was for "a defendant who plays a part in committing the offense that makes [her] substantially less culpable than the average participant." USSG § 3B1.2, cmt. n.3(A) (2014). Some circuits had held that "the average participant" referred to "the universe of persons participating in similar crimes," while others took the view that it referred to "those persons who actually participated in the criminal activity at issue in the defendant's case." USSG App. C, amend. 794, at 115 (Suppl. 2016). The Sentencing Commission intended to adopt the latter view, *id.* at 115–116, and changed the application note to read "a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant *in the criminal activity*," USSG § 3B1.2, cmt. n. 3(A) (2015); *see generally United States v. Wilson*, 802 F. Appx. 976, 979 (6th Cir. 2020). There is no mathematical formula by which the Court applies a mitigating role reduction; rather,

10

the "salient issue is the role the defendant played in relation to the activity for which the Court held . . . her accountable. *United States v. Roper*, 135 F.3d 430, 434 (6th Cir. 1998) (cited with approval by *United States v. Williams*, 635 F. Appx. 280, 285 (2015) (post-Amendment 794)).

After reviewing the facts of this particular case in light of the factors set forth above, the Court concludes that defendant has not met her burden of proving by a preponderance of the evidence that she is entitled to any mitigating role adjustment. She has not shown that she is "substantially less culpable than the average participant in the criminal activity." In fact, the record establishes the contrary, i.e., that she is at least as culpable as, if not more culpable than, the average participant.

The Court will not repeat all that was said above in relation to the other objection. Viewing those facts in light of the non-exhaustive factors in the commentary added by Amendment 794 leads to the conclusion, by a preponderance of the evidence, that defendant's culpability is not <u>substantially</u> less than that of the average participant and she is neither a "minor" nor a "minimal" participant in this criminal activity. She understood the scope and structure of the criminal activity. She made numerous trips with Hall to Georgia to obtain very substantial quantities of high-purity methamphetamine and returned with it to East Tennessee, where it was distributed throughout the counties located in the Northeastern Division of this Court. She knew the identity of the Georgia supplier and the identities of the East Tennessee distributors. She was apparently present when drug sales were made from the premises at 1223 Doe Creek Road. She collected proceeds from drugs sales while Hall was in jail and carried on the conspiracy in consultation with him, suggesting her familiarity with the scope and structure of the drug trafficking organization.

Anson also exercised some degree of decision-making authority jointly with Hall. After Hall went to jail, she acted as one with authority to collect drug debts, dealing directly with Hall's

11

distributors, and had conversation with one co-conspirator about Hall going on a "fishing spree again." (She told him it would probably be a while before Hall could go). The nature and extent of Anson's participation in the conspiracy was substantial, despite the stipulation with the government in the plea agreement that she would only be held responsible for a quantity of at least 35 but less than 50 grams of methamphetamine. Her involvement in the conspiracy also spanned a substantial period of time, approximately three years from "on or about February 1, 2015, and continuing to on or about November 14, 2018." [Docs. 3 & 79 ¶ 4.a. ("The defendant was a member of a drug trafficking organization, . . . under the direction of co-defendant Richard Hall, during the time frame of the conspiracy charged in the indictment.")]. When the premises at 1223 Doe Creek Road were searched on April 26, 2016, Anson was in possession of a distribution quantity of methamphetamine, firearms, a substantial amount of proceeds from the sale of drugs, and digital scales and baggies—all locked in her bedroom or in a safe for which she had the keys. And, although the evidence is slight about whether she stood to benefit from the criminal activity, her possession of a substantial amount of money from drug sales on April 26 and her personal efforts to collect drug sale proceeds suggest strongly that she did. There is no evidence that Anson participated in the planning or organization of the conspiracy, which weighs slightly in her favor. All told, however, these factors quite clearly lead to the conclusion that defendant is neither entitled to a decrease in the offense level as a "minor participant" nor as a "minimal participant," nor anywhere in between. This objection is **OVERRULED**.

There are no other guidelines objections. The Court adopts the PSR as the Court's findings. The total offense level is 25; the criminal history category is I. The advisory guidelines' range is 57 to 71 months of imprisonment. Sentencing has already been scheduled for November 19, 2020 at 1:30 p.m.

So ordered.

ENTER:

                                                        s/J. RONNIE GREER
                                        UNITED STATES DISTRICT JUDGE